AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

|  |  |
|---|---|
| LUZMINA B. ALVARADO RODRIGUEZ, as temporary administatrix of the Estate of DANIELA RAMOS GARCIA, ET AL<br><br>*Plaintiff(s)*<br><br>v.<br><br>THE CITY OF NEW YORK,<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.  16 CV 00214<br>)<br>)<br>)<br>)<br>) |

*AMENDED*

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   THE CITY OF NEW YORK
100 Church Street, New York, New York  10007

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   SUBIN ASSOCIATES, LLP
150 BROADWAY - 23RD FLOOR
NEW YORK, NEW YORK  10038

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____                           _____
                                                                          *Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
LUZMINA B. ALVARADO RODRIGUEZ, as temporary
administatrix of the Estate of DANIELA RAMOS GARCIA,
LUZMINA B. ALVARADO RODRIGUEZ, as temporary
administatrix of the Estate of JOCELYN THERESA RAMOS
GARCIA, Infant Decedent LUZMINA B. ALVARADO
RODRIGUEZ, as temporary administatrix of the Estate of DEISY
ARACELY GARCIA ALVARADO

**AMENDED COMPLAINT
AND JURY DEMAND**

DOCKET#: 16-cv-00214
ELECTRONIC FILING
CASE

Plaintiff(s),

-against-

THE CITY OF NEW YORK,

Defendant(s).
-------------------------------------------------------------------------------X

Plaintiffs, by their attorneys, Subin Associates, LLP for their complaint alleges as follows, upon information and belief:

## PRELIMINARY STATEMENT

1. This is a civil rights action in which plaintiffs seek relief the violation their rights secured by 42 USC §1983, §1988, the Fourth and fourteenth Amendments to the United States Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§2000d through 2000d-7.

2. This civil rights action arises from an instance of the New York City Police Department's (NYPD") discriminatory practice of denying interpreters and failing to translate Spanish written complaints into English to limited English proficient people ("LEP").

3. The claims arise from the January 18, 2014 murder of the three decedents, Daniela Ramos Garcia, Jocelyn Theresa Ramos Garcia, and Deisy Aracely Garcia Alvarado by Miguel Ramos-Mejia after the NYPD failed to translate domestic report incidents that were filed in Spanish by Deisy Aracely Garcia Alvarado seeking help and protection after Miguel Ramos-Mejia threatened to kill her and her children.

1

4.  That on July 22, 2008, Mayor Michael Bloomberg issued New York City's Executive order 120 ("EO 120"), which requires city agencies to provide interpretation services to LEP individuals.

5.  That the NYPD implemented the NYPD Language Access Plan ("LAP Plan").

6.  That United States Department of Justice compliance review found the NYPD "not fully in compliance" with the requirements of federal law, including Title VI and the Safe Streets Act, regarding their provision of language services to LEP New Yorkers.

7.  The NYPD's denial of interpreter services deprived plaintiff decedents of their right to protect themselves from a dangerous abuser of Miguel Ramos-Mejia who ultimately murdered them.

8.  That multiple plaintiffs have brought suit in the United States District Court for the Eastern District of New York, civil action number 13-cv-00076 (MKB) (REJ) *Padilla v. the City of New York et. al.* for equal protection and civil rights violations for the City of New York's failure to provide meaningful access to language translation services to Spanish speaking individuals.

9.  Plaintiffs hereby adopts the allegations set forth by the individuals in 13-cv-00076 (MKB) (REJ) *Padilla v. the City of New York et. al.* as set forth in the instant complaint as part of the plaintiff's proof of demonstrating the City of New York's widespread and prevalent discrimination through the City of New York's failure to provide meaningful access to language translation services to Spanish speaking individuals.

10. Plaintiffs seek monetary damages (special, compensatory, and punitive) against defendant(s), as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

**JURISDICTION**

11. This action is brought pursuant to 28 USC §1331, 42 USC §1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

12. The amount in controversy exceeds $150,000.00 excluding interest and costs.

## VENUE

13. Venue is proper in this Court pursuant to 2 U.S.C. §1391.

## JURY DEMAND

14. Plaintiffs demand trial by jury in this action each and every one of their claims.

## STATUTORY AND REGULATORY SCHEME

15. Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." Civil Rights Act of 1964, Title VI, 42 U.S.C. §2000(d). The denial of meaningful access to services for LEP individuals is considered national origin discrimination under Title VI.

16. The Safe Streets Act, 42 U.S.C. §3789d et seq., and its implementing regulations, codified at 28 C.F.R. §42.201 et seq., prohibit discrimination, inter alia, on the basis of national origin by programs funded in whole or in part from funds made available under 42 U.S.C Chapter 46. 42 U.S.C. §3789d(c)(4).

17. The Equal Protection Clause of the New York State Constitution similarly protects individuals from discrimination by the state or by any person acting under color of state law. N.Y. Const., Art. 1§11.

18. The First Amendment to the U.S. Constitution guarantees individuals the right to petition the Government for a redress of grievances. Violations may be remedied pursuant to 42 U.S.C. §1983.

19. Article I, §9 of the New York State Constitution affords individuals the right to petition the Government for a redress of grievances.

20. The New York City Human Rights Law "NYCHRL"), enacted in 1991, prohibits discrimination based on national origin in public accommodations. NYC Code §8-107.

3

21. The Law was extensively amended and straightened in 2005 by the passage of the Local Civil rights Restoration Act, Local Law No. 85 of 2005.

22. The NYCHRL provides:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the of the actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, or, directly or indirectly, to make any declaration, publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place or provider shall be refused, withheld from or denied to any person on account of race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status or that the patronage or custom of any person belonging to, purporting to be, or perceived to be, of any particular race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status is unwelcome, objectionable or not acceptable, desired or solicited.

NYC Code §8-107(4)(a).

23. Section 8-401 of the NYCHRL includes the following statement:

> [t]he council finds…that the social and moral consequences of systemic discrimination are…injurious to the city in that systemic discrimination polarizes the city's communities, demoralizes its inhabitants and creates disrespect for the law, thereby frustrating the city's efforts to foster mutual respect and tolerance among its inhabitants and to promote a safe and secure environment.

24. NYCHRL §8-130 provides that:

> The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed.

4

## PARTIES

25. Plaintiff Luzmina Alvarado Rodriguez is the temporary administratrix for the estates of Daniela Ramos Garcia, Jocelyn Theresa Ramos Garcia, and Deisy Aracely Garcia Alvarado and is a legal resident of the United States.

26. Defendant The City of New York (or "CITY") is a municipal corporation organized under the laws of the State of New York. It is authorized under the laws of the State of New York to maintain a Police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible.

27. At all times herein mentioned defendant(s) and/or defendant's agents and/or employees were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York and any such actions were attributable to defendant through the doctrine of Respondeat Superior.

## NOTICE OF CLAIM

28. That notice of plaintiff's claim and notice of intention to sue and of the time when and the place where the injuries alleged herein were incurred and sustained was duly filed by the plaintiffs with the Corporation Counsel of the defendant CITY and with the Comptroller of the defendant CITY and with the Legal Department of the NEW YORK CITY POLICE DEPARTMENT, hereinafter referred to as "NYCPD," within 90 days after the cause of action herein accrued.

29. That 30 days have elapsed since filing Notice of Claim and that a hearing was held concerning same.

30. That more than 30 days have elapsed since the demand for claim upon which this action was founded was presented to the Comptroller Legal Department of the defendants CITY and the Legal Department of the NYCPD, for adjustment and that he has neglected and refused to make adjustment or payment thereof for said period of 30 days after such presentation, and that this action is commenced within one year and ninety days after the cause of action accrued.

*5*

## STATEMENT OF FACTS

31. On July 22, 2008, Mayor Bloomberg issued Executive Order 120 ("EO 120"), "Citywide Policy on Language Access to Ensure the Effective Delivery of City Services," which requires each New York City agency that provides direct public services, including the NYPD, to "ensure meaningful access to such services by taking reasonable steps to develop and implement agency- specific language assistance plans regarding LEP persons." The Order further requires that each city agency designate a Language Access Coordinator, develop an appropriate language access policy and implementation plan, and provide language services based on at least the top six languages spoken by the population of the City.

32. In April 2009, the NYPD published its Language Access Plan (the "Plan"). The Plan requires NYPD officers responding to LEP individuals to provide interpretation services as necessary either via the Operations Unit, using NYPD employees to interpret, or through the use of a contracted interpreter via Language Line (a telephonic interpreting company). The Plan states that NYPD's policy is to "take reasonable steps to provide timely and meaningful access for LEP persons to the services and benefits that the Department provides to the degree practicable." The Plan further requires that "[w]hen performing law enforcement functions, members provide free language assistance to LEP individuals whom they encounter when necessary or whenever an LEP person requests language assistance services."

33. The United States Department of Justice ("DOJ") subsequently reviewed the Plan as implemented by the NYPD and found that the NYPD failed to comply with federal law, including Title VI of the Civil Rights Act of 1964 and the Safe Streets Act. The DOJ's compliance review consisted of an in-depth administrative analysis of the NYPD's policies and procedures with respect to LEP individuals. On November 8, 2010, the DOJ issued a 43-page report, addressed to New York Police Department Commissioner Raymond Kelly,

outlining various problem areas and shortcomings in the Plan and its implementation (the "Compliance Review"). On June 14, 2012, the NYPD released a revised Plan (the "Revised Plan").

34. As set forth below, despite its adoption of language access policies, and despite being notified by the DOJ of deficiencies in its policies and practices, the NYPD has continued to routinely deny LEP individuals access to police protection and to the broader legal system. Indeed, NYPD personnel not only fail to provide language services, but on many occasions actively mock and humiliate LEP individuals who request such services, and retaliate against them for making such requests.

35. Victims of domestic violence and other crimes, such as the Plaintiff decedents are particularly vulnerable to NYPD's unlawful practices, which leave them unable to communicate with police in emergency situations, to get the protection they need, to file police reports, and to obtain medical assistance.

36. That the NYPD's unlawful discriminatory practices have been prevalent and widespread and resulted in a lawsuit filed in the Eastern District for the State of New York United States District Court on January 4, 2013 in the case of *Padilla v. The City of New York, et. al.* civil action number 13-cv-00076 (MKB) (REJ) and plaintiffs hereby adopt the allegations of those plaintiffs as set forth herein.

37. Plaintiff Luzmina Alvarado is a legal resident of the United States with her residence of 90-20 161st St., Jamaica, NY 11432.

38. That Plaintiff Luzmina Alvarado Rodriguez was appointed temporary administrator of the Estate of Deisy Aracely Garcia-Alvarado on December 24, 2015 for 180 days from the date of issuance.

39. That Plaintiff Luzmina Alvarado Rodriguez was appointed temporary administrator of the Estate of Jocelyn Teresa Ramos-Garcia on December 24, 2015 for 180 days from the date of issuance.

40. That Plaintiff Luzmina Alvarado Rodriguez was appointed temporary administrator of the Estate of Daniella Ramos-Garcia on December 24, 2015 for 180 days from the date of issuance.

41. Plaintiff decedents Daniela Ramos Garcia, Jocelyn Theresa Ramos Garcia were United States citizens residing in Queens, New York.

42. Plaintiff decedent Deisy Aracely Garcia Alvarado's primary language was Spanish. She had limited ability to communicate in English.

43. Plaintiff decedent Jocelyn Theresa Ramos Garcia was the infant child of Deisy Aracely.

44. Plaintiff decedent Daniela Ramos Garcia was the infant child of Deisy Aracely Garcia.

45. That Deisy Aracely Garcia Alvarado did complain on multiple occasions to the New York City Police Department and the City of New York that she was in fear of her life and her infant children's lives because defendant Miguel Ramos Mejia threatened to physically harm and kill both her and her infant children.

46. That Deisy Aracely Garcia Alvarado made the aforesaid complaints to the New York City Police Department in Spanish both verbally and by written means.

47. That Deisy Aracely Garcia Alvarado did file domestic incident reports that were filled out in Spanish with the 103rd Precinct, Queens, NY on May 30, 2013 and November 27, 2013.

48. That the aforesaid domestic incident reports gave written notice of actual physical harm, emotional harm and assault, being perpetrated by Miguel Ramos Mejia against Deisy Aracely Garcia Alvarado and warned of death threats which Miguel Ramos Mejia threatened to kill Deisy Aracely Garcia Alvarado, Jocelyn Theresa Ramos Garcia, and Daniela Ramos Garcia.

49. That the City of New York and New York City Police Department failed to translate the written complaints of Deisy Aracely Garcia Alvarado from Spanish to English.

50. That the City of New York and New York City Police Department failed to provide a speaking translator to translate Deisy Aracely Garcia Alvarado's complaints verbally from

Spanish to English.

51. That as a result of the City of New York and New York City Police Department ignored the cries for help from Deisy Aracely Garcia Alvarado because those complaints were made in Spanish.

52. That as a result of ignoring those complaints based upon the complaints being made in Spanish, the City of New York did not provide any protective services to Deisy Aracely Garcia Alvarado and her infant children, Jocelyn Theresa Ramos Garcia, and Daniela Ramos Garcia.

53. That on January 18, 2014, Miguel Ramos Mejia acted on the threats that Deisy Aracely Garcia Alvarado had warned the City of New York and New York City Police Department of and assaulted, battered, stabbed multiple times and caused the death of the plaintiff decedents Deisy Aracely Garcia Alvarado and her infant children, Jocelyn Theresa Ramos Garcia, and Daniela Ramos Garcia.

54. That the aforesaid discrimination and failure to translate the complaints of Deisy Aracely Garcia Alvarado from Spanish to English was the proximate cause of her and her infant children's injuries and deaths.

55. That Miguel Ramos Mejia pleaded guilty to three counts of first degree manslaughter for the murders of Deisy Aracely Garcia Alvarado, Jocelyn Theresa Ramos Garcia, and Daniela Ramos Garcia.

**Yanahit Padilla Torres**

56. Upon information and belief, Yanahit Padilla Torres is a twenty-six year old Spanish-speaking woman from Mexico.

57. Upon information and belief, Ms. Padilla Torres speaks very limited English. She can understand some words but has difficulty with even the most basic phrases.

58. Upon information and belief, Ms. Padilla Torres lives in Brooklyn with her four year-old son Anthony.

9

59. Upon information and belief, From 2007 until 2011, Ms. Padilla Torres lived with her boyfriend, Anthony Rovira, who was physically and verbally abusive to her. Anthony set up video cameras in their apartment to monitor her activities.

60. On November 15, 2011, Mr. Rovira grabbed Ms. Padilla Torres by the feet and pulled her off the bed and began beating her. Ms. Padilla Torres pleaded with him to stop but he did not. She screamed for help and her son came into the room. Mr. Rovira stopped hitting her and left the room.

61. Ms. Padilla Torres then called 911. She asked for someone who spoke Spanish and a Spanish-speaking operator came on the phone. Ms. Padilla Torres told the operator that her boyfriend was beating her. She asked if they would send an officer who spoke Spanish.

62. Two police officers arrived shortly afterwards, including Officer Christopher Furda.

63. When the officers arrived, they approached Mr. Rovira, who is proficient in English, and began to speak with him. They did not speak with Ms. Padilla Torres even though she had called 911. Ms. Padilla Torres approached the officers while they were speaking with Mr. Rovira and tried to explain what had happened in Spanish. Officer Furda said something to the effect of, "We don't speak Spanish."

64. The officers continued to speak with Mr. Rovira, ignoring Ms. Padilla Torres, who continued to ask for help in Spanish.

65. Ms. Padilla Torres saw Mr. Rovira and the two officers smoking cigarettes together and talking and felt she was not going to get any help.  At this point, she called 911 again and asked them to send a Spanish-speaking officer to the scene. Ms. Padilla Torres told the operator that her boyfriend had beaten her and that she could not communicate with the officers who responded.  The operator told her she would send a Spanish-speaking officer.

66. In a little while, another patrol car arrived with an officer who spoke Spanish. Ms. Padilla Torres showed him the bruises on her arm and told him, in Spanish, that Mr. Rovira had hit her.

67. The Spanish-speaking officer said that Mr. Rovira also had marks on him, and that if she wanted to make a police report they would both be arrested and a judge would ultimately decide what happened. Ms. Padilla Torres indicated that she still wanted to make the report.

68. Officer Furda spoke with this officer, and then the Spanish-speaking officer told Ms. Padilla Torres that he needed to leave but that the other officers would take her report.

69. Ms. Padilla Torres' cousin, Janette Hernandez, arrived at this time. Ms. Padilla Torres had called her and asked her to come to watch her son.

70. Ms. Padilla Torres tried to ask the officers for their names and identification numbers in English, but they ignored her and refused to speak to her. They continued to speak only to Mr. Rovira.

71. Ms. Padilla Torres called 911 for a third time, this time asking for a police officer with a higher rank because the officers who responded were not assisting her.

72. Officer Furda told Ms. Hernandez in English that Ms. Padilla Torres should make a report stating that Mr. Rovira had not hit her because it would be easier. Ms. Hernandez responded that Ms. Padilla Torres would never do that since Mr. Rovira had beaten her.

73. A third patrol car then arrived. Officer Furda called Ms. Padilla Torres over to him, put her in handcuffs and put her in the patrol car. She saw that Mr. Rovira was also put in a patrol car but without handcuffs.

74. Shortly thereafter, around 3 a.m., Ms. Padilla Torres arrived at the 72nd precinct in Brooklyn. She was taken to a cell. She was given a piece of paper but could not understand what was written on it.

75. Since the officers had not explained what was happening, Ms. Padilla Torres was scared, worried about her son, and afraid that she was being incarcerated for a longtime.

76. Ms. Padilla Torres spent the night in the cell. In the morning, around 8:00 a.m., she was taken to another location where she was photographed. While a woman was patting her down, she touched Ms. Padilla Torres' arm where she had a bruise from the beating. It was

11

very painful for Ms. Padilla Torres and the woman looked at the bruise and suggested she be taken to a hospital for treatment.  This woman took Ms. Padilla Torres over to a Spanish-Speaking employee.

77. This employee examined the bruises and called over a supervisor who looked at the bruises and said something to the effect of, "this is domestic violence." Ms. Padilla Torres was then taken in an ambulance to Methodist Hospital by Officer Furda.

78. Officer Furda handcuffed Ms. Padilla Torres to the bed in the hospital, and remained with her the whole time she was in the hospital, even accompanying her to the bathroom. After she received treatment for her injuries, Officer Furda brought her back to the precinct. When they arrived at the precinct at approximately 6:00 p.m., she was allowed to go home. Ms. Padilla Torres was not provided with any explanation of why she had been arrested and was not told whether there were charges against her.

79. Mr. Rovira obtained an order of protection against Ms. Padilla Torres in Family Court based on her arrest on November 15th. As a result of the protective order against her, Ms. Padilla Torres spent one month and nine days separated from her three year-old son

**Arlet Macareno**

80. Upon information and belief, Arlet Macareno is a twenty-six year old woman from Mexico. Ms. Macareno's primary language is Spanish, and her ability to speak and understand English is very limited.

81. Upon information and belief, Ms. Macareno lives on Staten Island with her seven year-old son.

82. Upon information and belief, until recently, Ms. Macareno lived with her husband, Martin Cruz, in an apartment on the second floor of a house owned by her brother-in-law. The downstairs apartment was inhabited by various relatives of Mr. Cruz, including his twenty-two year-old niece, Angela Guzman.

83. Upon information and belief, Ms. Macareno's husband has a history of violence, and as a

12

result, Ms. Macareno has been the victim of domestic violence on several occasions.

84. Upon information and belief, one night in early August, 2012, in the presence of their son, Ms. Macareno's husband pushed her down a flight of stairs. As a result, she was seriously bruised, experienced blurred vision and dizziness.

85. Upon information and belief, when her niece, Ms. Angela Guzman, arrived home from work and saw Ms. Macareno lying at the bottom of the stairs, she called 911.

86. Shortly afterwards, four police officers and an ambulance arrived. Ms. Macareno tried to explain to the officers what happened using her very limited English, but the officers ignored her, electing instead to speak to her niece, who is proficient in English.

87. Ms. Macareno tried to get the officers' attention and asked for an interpreter by saying "interprete" (interpreter). One officer, Vincenzo Tradolse, turned to her and said, in English, words to the effect of, "I don't care, go to sleep." When Ms. Macareno persisted in trying to explain that her husband had pushed her down the stairs, Officer Tradolse responded in English, telling her to shut up and go to sleep.

88. The officers continued to ignore Ms. Macareno's repeated requests for an interpreter, instead conducting a conversation with her niece.

89. Officer Tradolse told Ms. Macareno, "callate la boca" (shut your mouth) and again said he did not care each time she requested an interpreter. The other officers just stood there watching and laughing.

90. Officer Tradolse then said to her in sum and substance, "if you don't callate la boca, I will arrest you." When Ms. Macarena continued to attempt to get Officer Tradolse's attention, he became angrier with her and then arrested Ms.Macareno.

91. The officers took no action against Ms. Macareno's husband, instead telling him to go upstairs to sleep.

92. The officers arrested Ms. Macareno, who was barefoot, and did not allow her to retrieve her

shoes from her apartment.

93. Ms. Macareno was in a lot of pain from the fall and was very scared. There were two officers in the front of the police car, Officer Tradolse and one other. There was another officer in the back next to Ms. Macareno. Since Officer Tradolse had told her to "callate la boca," Ms. Macareno then asked him, in Spanish, if he spoke Spanish. He answered, "oh si, si hablo espanol. Gol! Gol! Mexico! Vamos Mexico! Chicharito!" This means "oh, yeah, I speak Spanish, Goal! Goal! Mexico! name of a Mexican soccer player.) The two officers in the front began to laugh and speak in English, and Ms. Macareno could not understand what they were saying.

94. When they arrived at the precinct at around 2 a.m., Officer Tradolse took Ms. Macareno the long way around the car and made her walk through puddles in her bare feet. Inside the precinct, the floor was wet and she slipped. The officers laughed at her. Ms. Macareno asked for a lawyer or for someone who spoke Spanish to assist her.

95. Finally, an officer who spoke Spanish came over to her. Ms. Macareno told him that the other officers were making fun of her. This officer told her that it did not matter and that it would be their word against hers. Ms. Macareno told him that her husband had pushed her down the stairs and that she did not understand why she was arrested. He told her that she was arrested for her lack of respect for the police. Ms. Macareno asked him why – was it because she had asked for an interpreter? The officer then walked away.

96. Ms. Macareno attempted to tell the officers and employees at the police station that she was in pain from being pushed down the stairs. However, they failed to provide Ms. Macareno with any medical treatment. Instead, they put her in a cell where she spent the night.

97. The next day, Ms. Macareno was taken to criminal court and charged with Obstruction of Government Administration. Her brother paid for an attorney to represent her, but the lawyer did not speak Spanish or provide her with an interpreter. Ms. Macareno ultimately pled guilty to disorderly conduct.

14

98. After she was released, Ms. Macareno and her cousin Nancy, went to the 120th precinct to file a report regarding the domestic violence incident. Her cousin, who speaks English very well, filled out the form in English for Ms. Macareno. Although the officers were aware that Ms. Macareno was a limited English proficient Spanish-speaker, no one at the precinct told her that she could fill out the form in Spanish.

99. A few days later, a detective called Ms. Macareno's cousin Nancy and informed her that Ms. Macareno would be given an Order of Protection and that she should come to the precinct. Ms. Macareno went to the precinct, accompanied by her cousin. A detective came to speak with her but instead of using an interpreter, he just spoke directly to her cousin. Her cousin did not interpret the conversation but spoke directly with the officer. Ms. Macareno did not understand what they were saying. Her cousin explained that she needed to go to court to get the Order of Protection. Ms. Macareno said she felt she had been arrested for asking for an interpreter. When her cousin told the detective this, the detective said that Ms. Macareno had been charged with obstructing the investigation.

100. On August 8, 2012, Ms. Macareno obtained a Temporary Order of Protection against her husband, which is still in effect. A few days later, an officer accompanied Ms. Macareno to her apartment to gather her belongings. The officer who accompanied her did not speak Spanish and did not use an interpreter to speak with her. Her cousin accompanied her as well. While they were at the apartment, her husband's family, her cousin, and the officer had a long argument in English. Ms. Macareno could not understand most of the conversation. Finally her cousin explained to her that she had a right to stay in the apartment with her son and that her husband had to leave.

101. As she had nowhere else to go, Ms. Macareno decided to stay in the apartment with her son. However, the first day she was in the apartment without her husband, he came to the apartment and refused to leave. Ms. Macareno was scared and left. While she was gone, he changed the locks and she could not re-enter.

102. When Ms. Macareno went with her cousin to the precinct to complain that she had been locked out of her home and that her husband had violated her Order of Protection, the same English-speaking detective who had spoken to her the last time she was at the precinct was there and again failed to use an interpreter to communicate with her. Again, her cousin spoke directly to the detective to explain what happened and Ms. Macareno was not offered any way to communicate with the police herself.

103. As a result of the arrest and the treatment she received from the police, Ms. Macareno feels traumatized. Ms. Macareno feels that if something happened to her, she would not call the police or go to a precinct again because she fears the police and does not believe they would protect her.

**Wendy Garcia**

104. Wendy Garcia is a thirty-three year-old Spanish-speaker from Guatemala.

105. Her English is very limited.

106. Ms. Garcia lives in Queens with her two sons, ages five and seven.

107. In August, 2012, Ms. Garcia was in an intimate relationship with Alex Moncada.

108. On August 20, 2012, in Ms. Garcia's apartment, Mr. Moncada pushed Ms. Garcia and she fell to the floor. He also slammed a door on her, injuring her elbow and foot.

109. Because Mr. Moncada had been violent with her before, and she did not want the violence to escalate, Ms. Garcia called 911. Ms. Garcia requested a Spanish-speaking operator and was able to explain in Spanish what had happened to her.

110. Shortly afterward, four police officers, including Officer Joseph Matthews, arrived at Ms. Garcia's building, none of whom spoke Spanish. When Ms. Garcia requested a Spanish speaker, one of the officers told her that there was nobody who could speak Spanish to her. The officer said something to the effect of, "No Spanish, only English." Ms. Garcia then struggled in English to tell the officer that she would not be able to explain what had happened in English.

111. The police officer then asked her in English, "you ok?" and Ms. Garcia responded that she was not ok. Her elbow hurt from the fall and being crushed in the door, but she was not sure of the word for elbow in English.

112. The officer then instructed her to sit in a corner and went over to speak to Mr. Moncada, who speaks English well.

113. Concerned that she would not be able to tell her side of the story, Ms. Garcia called her brother and requested that he translate for her.

114. When she tried to hand the phone to the police officer and to explain that her brother would translate, the police officer said, "no, no" and took the phone away. The officer then threw the phone on the counter.

115. Frustrated and scared, Ms. Garcia began to cry. One of the officers asked her something to the effect of, "why are you crying?" Ms. Garcia again tried to communicate in English that she needed to speak to someone in Spanish. The police officer said something to the effect of, "no, only English."

116. One of the police officers gave Ms. Garcia a form to fill out with her personal information and room to make a statement. No one told her she could write in Spanish, but she did write a statement in Spanish.  No one gave her a copy of this form.

117. After speaking exclusively to Mr. Mocada, the officers wrote a report. Ms. Garcia then heard the officers say something to Mr. Moncada about arresting her. Ms. Garcia understood Mr. Moncada when he said that she should not be arrested because of her children.

118. One of the officers asked Ms. Garcia if she had pushed Mr. Mocada, and she tried to explain what had actually occurred, but was unable to do so due to her limited English. The police officers then completed the report and gave a copy to Mr. Moncada but not to Ms. Garcia.

119. Ms. Garcia tried unsuccessfully to explain to the officers that she wanted Mr.

120. Moncada to leave because he did not reside there. However, the officers never asked Mr.

17

Moncada to leave and never asked Ms. Garcia whether she wanted him to leave.

121. As the police officers were leaving, the one who had spoken to Ms. Garcia previously again spoke to her in English. She understood him to say he was not going to arrest her now but they would arrest her if she called 911 again.

122. When the police left, Ms. Garcia felt deceived, frustrated and scared because the police had threatened to arrest her. She felt that if Mr. Moncada became violent again, she would not call the police. Instead of staying in her apartment, where Mr. Moncada remained, Ms. Garcia woke up her son and took him to her mother's house in Brooklyn.

123. On or about August 22, 2012, Ms. Garcia went to the Family Justice Center in Queens and spoke to a counselor from Sanctuary for Families about the events of August 20th. The counselor called the 102nd Precinct for Ms. Garcia and found out that a report had been filed against Ms. Garcia by Mr. Moncada on the night of August 20th alleging that she hit him.

124. On or about August 23rd, Ms. Garcia went to the 102nd Precinct to get a copy of the report. When she requested a Spanish interpreter, she was told she would have to wait.

125. After waiting for ten minutes, she called a counselor from VIP, where she had been seeking services as a domestic violence victim. Her counselor attempted to call the precinct herself. The counselor then called the supervisors at Borough Patrol Queens South, and requested an interpreter for Ms. Garcia.

126. Rather than call a qualified interpreter, Ms. Garcia heard an officer at the precinct ask around the precinct if anyone spoke Spanish. Ultimately, the officer found someone with limited Spanish who assisted Ms. Garcia. Ms. Garcia said she wanted a copy of the police report but was told that it was not in the system.

127. The officers in the precinct gave Ms. Garcia the number of a police officer she could call for further assistance in Spanish but she felt so awful from the whole experience that she left the precinct without seeking further assistance.

128. Ms. Garcia was frustrated and disheartened that the police repeatedly refused to

18

communicate with her in Spanish when she needed help. As a result of this incident, Ms. Garcia distrusts the police and feels she cannot call upon them because she fears that she will be arrested if she seeks assistance in the future.

**Lina Carrion**

129. Lina Carrion is a thirty-nine year old woman who was born in Ecuador. Her primary language is Spanish and she speaks very limited English.

130. Ms. Carrion lives in Brooklyn, New York with her ten year-old daughter, Jennifer Pizarro, and Ms. Carrion's two brothers.

131. On August 12, 2012, Ms. Carrion found out that her boyfriend had been sexually abusing her daughter for a period of approximately three months. The next day, Ms. Carrion brought Jennifer to Lutheran Hospital to been examined.

132. Upon arrival at the hospital, Jennifer and Ms. Carrion were interviewed by an English-speaking nurse through an interpreter, and then by a Spanish-speaking social worker.

133. The social worker told Ms. Carrion that she was going to call the police because of the sexual abuse. Ms. Carrion asked her to request a Spanish-speaking officer since her English is very limited.

134. When two English-speaking police officers arrived at the hospital, Ms. Carrion again requested an officer who spoke Spanish. One of the officers made a phone call, but when two additional officers arrived shortly thereafter, neither spoke any Spanish.

135. Ms. Carrion again stated that she needed someone who could speak to her in Spanish, but was told in sum and substance that an interpreter was not needed because her ten- year-old daughter speaks English.

136. Given the intimate nature of the situation and in light of her desire to understand the officers' communication with her young daughter, Ms. Carrion again requested an officer who spoke Spanish.

137. Despite Ms. Carrion's repeated requests for a Spanish-speaking officer, the officers

proceeded to interview Jennifer in English for approximately thirty minutes. Ms. Carrion could not understand what was being said. Despite Ms. Carrion's repeated protests, the interview continued without an interpreter.

138. Ms. Carrion was extremely upset that she could not understand the conversation. She complained to the social worker and asked her if she could interpret, but the social worker was very busy and said she could not.

139. After a period of time, two additional officers arrived who did not speak Spanish. They helped finalize the police report and had Ms. Carrion's daughter fill in a portion in English.

140. One of the officers asked Ms. Carrion to sign the report. Despite the fact that she was unable to understand what the report said, Ms. Carrion signed it. Neither she nor her daughter was given a copy of the report.

141. The officers' failure to provide Ms. Carrion with an interpreter or Spanish- speaking officer prevented Ms. Carrion from being able to communicate what she knew about the assaults on her daughter to the police officers, provide support to her young daughter during a very sensitive time and to understand the steps the police were taking regarding the abuse.

142. Ms. Carrion felt upset and frustrated, and felt that she was being discriminated against by the police.

**Silvia Soriano**

143. Sylvia Soriano is a thirty-four year old Spanish speaker from Mexico. Her ability to communicate in and understand English is very limited.

144. Ms. Soriano lives in Staten Island with her husband, Jose Velez, and three of her four children, aged 2, 5, and 15.

145. Ms. Soriano moved to Staten Island from the Bronx in December 2011. Since relocating, her family has received repeated threats and been subjected to multiple acts of violence by other residents of the New York City Housing Authority ("NYCHA") project where they live. She believes her family is a target of threats because they are Mexican.

146. Ms. Soriano's 18 year-old son, Jose Franco, relocated to Mexico after being beaten up and threatened for being Mexican by residents in the NYCHA project where they live.

147. In mid-August, 2012, Ms. Soriano was in a park near her home with her husband and three children, when approximately fifteen teenagers approached a group of children playing and made a circle around them. The teenagers hit and spat on the children, and one of the teenagers repeatedly threw a basketball at Ms. Soriano's five year-old. Ms. Soriano called 911, explaining in Spanish what was occurring.

148. The teenage perpetrators continued to taunt and threaten Ms. Soriano's children. When she attempted to protect her children, one of the teenagers took out a gun, pointed it at her head, called her a "Fucking Mexican," and instructed her to leave the area. Her husband also heard one of the perpetrators say words to the effect of "this won't end until you leave." They continued to taunt the Soriano family until Ms. Soriano requested that another person in the park take a photograph of them, at which point they ran away.   Before they left, the teenager with the gun told Ms. Soriano's daughter that her mother better "get out of his face" or he would kill them.

149. When the police did not respond after about fifteen minutes, Ms. Soriano's husband called 911 again to complain that they were in danger and the police had not arrived. The responding officers, who did not speak Spanish or use interpreters to communicate with Ms. Soriano and her husband, arrived after another ten minutes.

150. Ms. Soriano struggled to tell them that she needed to speak with someone who spoke Spanish. The officer responded to her request saying in sum and substance "this is America, you have to speak English."   When Ms. Soriano's daughter attempted to tell the officers what happened, they instructed Ms. Soriano and her family to return to their home.

151. Then Ms. Soriano became desperate, pointing to the cameras on the building because she thought there would be recordings of the people who had assaulted her family. The officers did not understand what she was trying to communicate and without attempting to

understand, began to laugh.

152. Later that day and in the days that followed, the Sorianos were taunted and threatened by the same teenagers.

153. When Ms. Soriano went to the NYCHA office to request a transfer to another housing project because of the threats, she was told that she needed to provide NYCHA with a police report.

154. NYCHA gave Ms. Soriano a crime report form, which she tried to fill out and mailed to the 120th Precinct. A few days later, she went to the precinct to check on it. No one spoke to her in Spanish and they refused her requests for an interpreter, stating in sum and substance that no one at the precinct spoke Spanish.

155. A police officer then offered to speak to Ms. Soriano's daughter in English, and told her that the computers were not working and that they needed to come back another day.  He handed her a form and told Ms. Soriano she could fill it out and mail it back.

156. Ms. Soriano did send the form in but it was sent back to her with instructions in English saying that she needed a complaint number and could get that number by calling the precinct.

157. On October 1, 2012, Ms. Soriano returned to the 120th Precinct with her attorney. Her attorney requested an interpreter for Ms. Soriano in order to file a police report. An officer told her attorney that no one was available who spoke Spanish, and instead asked the attorney if she could interpret for Ms. Soriano. When her attorney refused, and pointed to the sign regarding the provision of free interpreter services, the officer sighed and rolled his eyes.

158. After making Ms. Soriano and her attorney wait for approximately fifteen minutes, he eventually found a Spanish-speaking officer who took Ms. Soriano's complaint.

159. On January 5, 2013, a neighbor in Ms. Soriano's apartment building began banging on the walls and door to Ms. Soriano's apartment. When Ms. Soriano's husband opened the door,

22

the man began insulting them in English and saying things to the effect of, "you fucking Mexicans" and "fucking immigrants" and threatening them with violence.  Ms. Soriano's fifteen year-old daughter called 911.  After twenty-five minutes when no police officers had arrived, she called again. When speaking with the 911 operator, Ms. Soriano's daughter requested that the police send a Spanish-speaking officer to her home because her parents do not speak English well.

160. Approximately five officers arrived at the home and none of them were able to communicate with the Soriano family in Spanish. Ms. Soriano said to one officer, "yo no hablo Ingles" (I don't speak English). The officer responded something to the effect of "no Spanish."

161. Ms. Soriano's fifteen year-old daughter interpreted what the police were saying for her parents. The police said that there was nothing they could do and that the family should make a complaint with the NYCHA housing office. The officers did not offer to file a police report for the family.

162. Because they feared for their safety, on January 7, 2013, Ms. Soriano and her husband returned to the 120th precinct to attempt to file a police report about the ongoing threats from their neighbors. Ms. Soriano requested assistance in Spanish at the precinct and was told that no one was there who could speak Spanish.

163. Ms. Soriano's husband attempted to communicate with the officers in the precinct in very basic English. He tried to explain that the family was receiving ongoing threats and harassment because they are Mexican.  The officers did not take a police report. Ms. Soriano's husband felt he could not explain everything that he wanted to because he was not able to speak to someone in Spanish.

164. In early 2013, Ms. Soriano called 911 at approximately 2:00 a.m. when she found her daughter's boyfriend in her apartment without her permission. Ms. Soriano subsequently sought an Order of Protection against him on behalf of her daughter because he is twenty-

23

four years old and her daughter is fifteen. Additionally, she fears for her daughter's safety with him.

165. When the police responded to her call, Ms. Soriano could not communicate the situation to them because they did not speak Spanish or offer her an interpreter. One of the officers asked Ms. Soriano if she spoke English. When she answered no, the officer said something to the effect of, "then there is nothing we can do." The police officers began to laugh and left the premises.

166. The NYPD officers' failure to provide Ms. Soriano and her husband with an interpreter, both at their home and at the 120th precinct, deprived Ms. Soriano of access to police protection. NYPD's refusal to provide her with assistance from a Spanish-speaking officer or interpreter also prevented her from being able to file reports about various threats against her and her family, and impeded Ms. Soriano's ability to transfer to a safer NYCHA project.

167. As a result of her inability to file the appropriate reports, Ms. Soriano fears for the lives and safety of her family, feels helpless, and feels she is being discriminated against because of her national origin and because she is unable to speak English.

**Maria Irma Henriquez**

168. Maria Irma Henriquez is a twenty-six year old woman who was born in El Salvador.

169. Ms. Henriquez has very limited English and also cannot read in English.

170. Ms. Henriquez is the survivor of extreme domestic violence at the hands of her former partner and the father of her son, Mr. Juan Guzman-Torres. Ms. Henriquez lived with Mr. Guzman-Torres from 2007 until late2009.

171. Ms. Henriquez and Mr. Guzman-Torres have a child together, Eric Guzman, who was born on February 3, 2008. Ms. Henriquez also has a child from a previous relationship, Katerin Mejia Henriquez, who was born on January30, 2003.

172. After approximately one month of living together, Mr. Guzman-Torres began to abuse Ms. Henriquez on a regular basis. He would also prohibit her from leaving the house by taking

24

her keys.  Mr. Guzman-Torres was a habitual drinker and would become very violent when inebriated.

173. Ms. Henriquez suffered regular bruising and bleeding from the beatings. Mr. Guzman-Torres would often punch her, pull her hair, hold a knife to her, and throw plates of food at the walls. The abuse happened almost on a daily basis.

174. Ms. Henriquez was also abused throughout her pregnancy with their son. On many occasions, Mr. Guzman-Torres would beat her while she was pregnant and threaten to kill the unborn fetus. Ms. Henriquez was fearful of leaving him and had no relatives or friends to turn to because Mr. Guzman-Torres would not permit her to be in contact with anyone.

175. One night in February 2008, when Eric was approximately one month old, Mr. Guzman-Torres violently abused Ms. Henriquez and held a knife to her neck. When he fell asleep later, she took her baby and climbed down the fire escape. Freezing and injured from the beating, she called 911.  Mr. Guzman-Torres was arrested.

176. Ms. Henriquez later allowed Mr. Guzman-Torres to return home because she was desperate. She had no way of supporting herself and no one else to turn to. The abuse continued.

177. During the next four years, Ms. Henriquez estimates that she called the police approximately fifteen times as a result of the violence. Because of the severity of her head injuries that resulted from the beatings, she has memory problems making it difficult to remember many dates and details.

178. When Ms. Henriquez would call the police after being abused, Mr. Guzman- Torres would often leave the home. Sometimes police would respond, but on more than one occasion, no one ever arrived.

179. Usually Ms. Henriquez would speak in Spanish with the 911 operator, but when the police would arrive, no one would communicate with her in Spanish or offer to get her an interpreter. Because the police rarely were able to communicate with her, she often was not able to file police reports when the police came to her home. The police would often resort

25

to attempting to communicate with her using hand signals and speaking in English.

180. Ms. Henriquez was only able to file a Domestic Incident Report on approximately two occasions, July 2, 2008 and July 29, 2008.

181. On November 30, 2008, the violence had escalated and Ms. Henriquez was living in fear of Mr. Guzman-Torres. One day she called 911 when Mr. Guzman-Torres was in the home and the police came and arrested him. Ms. Henriquez does not remember any of the police officers communicating with her in Spanish. As a result of this arrest, Ms. Henriquez was able to secure her "U" visa, securing her U non-immigrant status.

182. When Mr. Guzman-Torres was released, he no longer lived with Ms. Henriquez but would continue to follow her, harass her, meet her at her workplace and violate the Order of Protection she had secured against him.

183. Sometimes Ms. Henriquez would call 911 when he violated the Order of Protection or abused her. Sometimes she would call once or twice a week because he would find her and beat her.  The officers who responded to her calls usually did not communicate with her in Spanish and did not allow her to make a Domestic Incident Report.

184. Ms. Henriquez did not feel that the police understood her and as a result, did not feel that they took the violence seriously.

185. On September 14, 2011, Ms. Henriquez left the restaurant where she worked at approximately four or five a.m. Mr. Guzman-Torres grabbed her on the street and put her in his car. He began insulting her, beating her and holding her by the hair with one hand while driving with the other. He was inebriated and driving very fast. Ms. Henriquez tried to open the window and tried to scream; she even tried to throw herself out of the car.

186. Mr. Guzman-Torres continued to beat her in this manner for approximately one and half hours.  Mr. Guzman-Torres threatened to kill her.  Ms. Henriquez lost consciousness for part of the time because of the beating. Ms. Henriquez thought she would die. Finally, he threw her out of the car into the street with oncoming cars. As she was thrown out, she grabbed the

mirror which fell off of the car.

187. Ms. Henriquez, who was visibly injured and disheveled, called 911 after wandering about in a daze. The police arrived but they did not speak Spanish. They did not offer her an interpreter or otherwise attempt to communicate with her in Spanish to find out what had happened. They took her to her home and left her with her aunt. She was not given an opportunity to make a report or asked to make a statement. The police officers did not ask her who had hurt her.

188. Ms. Henriquez immediately called her lawyer, Marisol Arriaga, at the Legal Aid Society who had been assisting her with her immigration case. On September 16, 2011, Ms. Arriaga called the 50th precinct in the Bronx and spoke with DVPO Grogan. She explained to Officer Grogan that Ms. Henriquez had been severely brutalized and needed to file a report and that she would be coming to precinct shortly. Ms. Arriaga then prepared a letter to the precinct requesting that they provide Ms. Henriquez with interpretation services in order to file a report about the violent episode.

189. Ms. Henriquez went to the precinct with the letter from Ms. Arriaga but even after presenting the letter from Ms. Arriaga to employees at the precinct no one there offered to provide her with an interpreter or take her report.

190. A Spanish-speaking receptionist looked up her name in the computer system and explained that Mr. Guzman-Torres had made a report against her stating that she had broken the mirror on his car. Ms. Henriquez stated that she had been violently assaulted by him and that she needed an Order of Protection. The receptionist told her that they could not help her make a report.

191. Mr. Guzman-Torres was never arrested as a result of this incident and Ms. Henriquez never secured an Order of Protection against him as a result of this incident. Later that day Mr. Guzman-Torres called her to tell her that he had filed a report against her. He also showed up at her apartment with the report and waved it in her face, laughing and saying that she

would never be able to make a report against him and threatening her with more violence. This was extremely traumatizing to Ms. Henriquez.

192. Ms. Henriquez has extensive injuries as a result of the years of violence that she suffered, including regular migraine headaches, very severe memory problems, almost constant pain, vision problems, and difficulty understanding people who talk to her.

193. Ms. Henriquez never tried to seek assistance from the police again because she feels they are not on her side and will not assist her.

**Elena Jimenez**

194. Elena Jimenez is a thirty-four year old Spanish-speaking woman from the Dominican Republic.

195. Ms. Jimenez is a monolingual Spanish speaker. She does not speak English but she can understand some English.

196. From March 2, 2013 to February 7, 2014, Ms. Jimenez lived at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, with her four year-old son, Amaurys.

197. From March 2, 2013 until November 2013, Ms. Jimenez lived with her husband, Amaurys Mata, who was physically and verbally abusive towards her.

198. On August 22, 2013, at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, Ms. Jimenez filed a domestic incident report with the New York Police Department (NYPD) after Mr. Mata grabbed her arms and pushed her onto the sofa, causing pain to both arms. She wrote a statement in Spanish on the domestic incident report and reported the incidents to a Spanish-speaking police officer.

199. On or about November 29, 2013, at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, Ms. Jimenez filed a domestic incident report with the NYPD after Mr. Mata verbally and physically assaulted her. While intoxicated, Mr. Mata called Ms. Jimenez derogatory names, refused to let her leave the apartment, and took her cell phone when she attempted to call a cab.

200. He then pushed her to the edge of the bed, forcefully grabbed her arm, kicked her thigh, and caused her to sustain bruising and be in substantial pain. When he grabbed her, his whole body weight was on top of her, causing her to suffer a miscarriage a few days later. She was seven weeks pregnant. He also cut the telephone cable wire so that she could not use the land line to call for help.

201. Eventually, Ms. Jimenez was able to call 911 using someone else's cell phone. Two English-speaking officers arrived, one of whom spoke basic Spanish. She explained to the officer who spoke basic Spanish what happened to her. She explained that Mr. Mata had grabbed her arms, kicked her leg, and put his whole body weight against her body. She explained that he had taken her cell phone and cut the telephone cable. She showed the officers her arms which were red and in pain. The officers spoke with Mr. Mata, who was intoxicated. During the conversation, Mr. Mata agreed that he would leave.

202. As he was leaving, Ms. Jimenez asked the officer, in Spanish, "He's not going to be arrested?" The officer responded, "No, he's leaving." The officer then told her that she could go to Family Court to get an order of protection. Ms. Jimenez was surprised that Mr. Mata was not arrested for assaulting her. She wrote a statement in Spanish about what had happened to her and it was included in the Domestic Incident Report.

203. Over the next week, and for several weeks afterwards until approximately January 27, 2014, Mr. Mata threatened to kill Ms. Jimenez by phone and by text message on multiple occasions. He called from numerous phone numbers but Ms. Jimenez always recognized his voice. On two occasions, Mr. Mata said, "Don't worry. I'm going to kill you."

204. On or about December 2, 2013, Ms. Jimenez filed a Family Offense petition in Bronx Family Court, seeking an Order of Protection against Mr. Mata. Ms. Jimenez was granted a temporary order of protection and was advised to return to court on December 6, 2013.

205. Sometime between November 29, 2013 and December 5, 2014, Ms. Jimenez suffered a miscarriage, and experienced severe physical and emotional pain.

29

206. On December 5, 2014, Ms. Jimenez was released from Montefiore Medical Center. Her doctor advised her not to go to court because she was prescribed bed rest. On the following day, December 6, 2014, Ms. Jimenez was recovering from her miscarriage and could not attend the appearance. Her petition was dismissed without prejudice.

207. On or about January 6, 2014, Ms. Jimenez filed a new Family Offense petition in Bronx Family Court and received a Temporary Order of Protection, valid until February 3, 2014. Mr. Mata's mother handed him a copy of the Temporary Order of Protection on or about January 15, 2014. The order of protection required Mr. Mata to stay away from Ms. Jimenez and their son, Amaurys, their home, and Amaurys's school. He was also ordered to refrain from communication or any other contact with them and to refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, or any criminal offense against them.

208. On or about January 29, 2014, at approximately 5pm, at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, Ms. Jimenez returned home with her son, who was ill and had just been released from the emergency room, and discovered that the locks to her apartment had been changed without her knowledge or permission. She called 911 and spoke with a Spanish-speaking operator.

209. About an hour later, two police officers arrived, neither of whom spoke Spanish. One of the officers was Officer Sweeting.  With the help of a neighbor present in the building lobby, Ms. Jimenez explained, with the neighbor acting as an interpreter, that she had an order of protection from Bronx Family Court and that her husband had changed the locks of her apartment without her knowledge and in violation of the order of protection. With her neighbor's interpretation, she also explained that Mr. Mata had been making death threats against her.

210. It appeared that no one was present in her apartment. Ms. Jimenez filed another domestic incident report, and wrote a statement in Spanish. The officers wrote that Mr. Mata was charged with the crimes of Aggravated Harassment and Unlawful Eviction on the Domestic Incident Report, and noted that Mr. Mata had made death threats against Ms. Jimenez. The officers told Ms. Jimenez that they did not have authorization to open the door and that she could go get a locksmith. They told Ms. Jimenez they could not do anything more. They told her that if her husband were present then they would arrest him but that since he wasn't there, they couldn't do anything.

211. Unable to get into her apartment, Ms. Jimenez had no clothes or food or milk for her son. She had to borrow clothes from a friend for herself and her son.

212. On or about January 30, 2014, at approximately 6pm, at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, Ms. Jimenez returned home with her four year old son, who was still ill and had spent a second day in the emergency room due to a persistent fever. When she arrived, she discovered that the locks to her apartment were still changed and she and her son were unable to enter. She planned to call a locksmith but then she heard her husband inside the apartment. She called 911 and spoke with a Spanish-speaking operator. She advised the operator that she had a valid order of protection and that she believed Mr. Mata was in her apartment and that he had changed the locks. She explained to the 911 operator that she needed a Spanish-speaking police officer.

213. Ms. Jimenez waited with her son for the police to arrive. She waited for over an hour and a half. She called two times, explaining that she needed an officer to arrive while her husband was present. She also explained the situation to her neighbor who lived in her building and who is a police officer in Long Island. Her neighbor, Jie, called 911 on her behalf two times while they waited.

214. Finally, two English-speaking officers arrived who did not speak Spanish. Ms. Jimenez asked them for a Spanish interpreter. They ignored her request. She said numerous times in

Spanish, "I do not speak English", "Please" "I need someone to explain things to me." She then called her neighbor, Jie, on her phone and asked him to interpret for her, using the speaker phone option on her cell phone. With the assistance of Jie, Ms. Jimenez explained to the police officers who had arrived that she had a valid order of protection against Mr. Mata and that he had unlawfully changed the locks to her apartment. She showed the officers her copy of the order of protection and asked them to give a copy to Mr. Mata. The whole time that she was explaining what help she needed, one of the police officer was holding her cell phone in his hand, as Jie attempted to interpret on her behalf.

215. As they went upstairs to the apartment, the officers told Ms. Jimenez that they did not want to continue to use the interpretation services of her neighbor, via cell phone, because they said he wasn't authorized. Ms. Jimenez declined to hang up the phone and continued to ask her neighbor to interpret for her.

216. When the police officers arrived at her apartment and knocked on the door, Mr. Mata opened the door and was in the apartment with a woman and a man. Mr. Mata and his friends spoke English with the police officers. The police officers did not give the order of protection to Mr. Mata, even though one of them was holding the order of protection in his hand. They did not arrest Mr. Mata.

217. While Ms. Jimenez waited outside of her apartment, the police officers, Mr. Mata, and Mr. Mata's friends began putting her belongings into trash bags. When she saw what they were doing, she tried to explain, with the help of Jie, that those were not the things that she needed and that she needed her son's clothing. The officers told Ms. Jimenez that she had five minutes to collect her personal belongings and to leave the apartment. After three minutes of trying to collect her things, one of the police officers pushed Ms. Jimenez and told her that she had to leave.

218. While the police officers, Mr. Mata, and his friends were putting her personal items into trash bags, the police officers laughed with Mr. Mata and mocked Ms. Jimenez for living in

this country and not speaking English. One of the police officers said to Ms. Jimenez, "Your husband is having a party. You should stay quiet." Ms. Jimenez understands enough English to know what they were saying, even though she cannot speak English.

219. Throughout this entire incident, Ms. Jimenez attempted to explain to the officers repeatedly and with the assistance of her neighbor, that she lived in the apartment with her son and that she had an order of protection against Mr. Mata. Unsuccessful in persuading the police officers, Ms. Jimenez had no choice but to leave the apartment with her sick son. She was not permitted to file a domestic incident report.

220. The police officers left the trash bags containing her personal items on the sidewalk in front of her building. When Ms. Jimenez's friend came out of his car to help her pick up the trash bags, the officers told him in English "You speak English? No? Move it, move it, move it." The officers motioned for her friend to move away. One of the officers then gave her the order of protection back.

221. After taking her personal items to a friend's house, Ms. Jimenez went to the 52nd precinct

222. to request assistance from a Spanish-speaking police officer. She spoke with Officer Vidal,

223. who spoke to her in Spanish, and explained what had happened. Officer Vidal asked her if she saw the officers who had responded to the 911 call in the precinct. Ms. Jimenez said that she did not. Ms. Jimenez then waited until the officers arrived. When they walked into the precinct, Ms. Jimenez informed Officer Vidal that they had arrived. Officer Vidal asked the officers what had happened and they told him that they were not able to communicate with Ms. Jimenez because she speaks Spanish.

224. Officer Vidal informed Ms. Jimenez that the officers had made a mistake and told her that they would correct the mistake. They told her not to worry. Two police cars then accompanied Ms. Jimenez back to her apartment. Of the four officers with Ms. Jimenez when they went back to her apartment, two spoke Spanish and two did not. One of the officers was Officer Vidal. When they entered the apartment, they arrested Mr. Mata. Ms.

33

Jimenez was never permitted to file another domestic incident report.

225. Ms. Jimenez lost over $9000 in cash and personal property while she was unlawfully evicted from her home. The next day, Ms. Jimenez's son's condition worsened and she was forced to take him back to the emergency room. He suffered from a persistent fever and a throat infection.

226. Ms. Jimenez fears for her life and the life of her son, and believes that the police gave her husband numerous opportunities to kill her when they failed to arrest him in November and January. Had she not returned to the precinct and found a Spanish-speaking officer, Ms. Jimenez fears that her husband would never have been arrested and would have killed her. She fears that the police are unable and unwilling to protect her against her husband, and she believes that the police discriminated against her for not speaking English.

**Graciela Simbana**

227. Graciela Simbana is a twenty-five year old woman from Ecuador who resides on Staten Island. Ms. Simbana's primary language is Spanish, and her ability to speak and understand English is very limited.

228. Ms. Simbana had a full stay-away Temporary Order of Protection from criminal court against Daniel Almazo that was issued on October 20, 2013.

229. On April 14, 2014, Mr. Almazo physically attacked Ms. Simbana at her home on Staten Island.

230. Ms. Simbana called 911 and spoke to an operator in Spanish. The operator told Ms. Simbana that the NYPD would send a Spanish-speaking officer to the scene.

231. When the responding officers arrived, neither of them was Spanish-speaking.

232. The officers communicated only with Mr. Almazo in English, and ignored Ms. Simbana's injuries and her attempts to communicate.

233. Ms. Simbana's friend then asked an English-speaking relative of the landlord to help interpret for Ms. Simbana.

234. Only with the help of the landlord's relative, Mr. Almazo was persuaded to surrender his keys to the apartment and to leave the scene, and the police were persuaded to fill out a DIR.

235. However, even though Ms. Simbana had visible injuries from the attack and showed the officers the full stay-away Temporary Order of Protection, the officers failed to make the mandatory arrest of Mr. Almazo.

236. The NYPD made no attempt to arrange for appropriate interpretation for Ms. Simbana in light of the domestic violence situation. Moreover, aside from the violations of NYPD language access policy, in this incident the officers once again violated the NYPD's most basic policies and procedures regarding domestic violence incidents and enforcement of orders of protection.

**Oumou Sylla**

237. Ms. Oumou Sylla is a thirty-four year old French-speaking woman from Guinea who resides in the Bronx. Ms. Sylla's ability to speak and understand English is very limited.

238. On May 21, 2014, Ms. Sylla's husband, Moussa Kalissa, called 911 and falsely alleged that Ms. Sylla was attacking him. Ms. Sylla then called 911 herself and spoke to an operator in broken English.

239. When officers arrived from the 40th Precinct, they spoke only to Ms. Sylla's husband in English, but made no attempt to arrange for interpretation for Ms. Sylla despite her obvious inability to communicate in English.

240. Based solely on Mr. Kalissa's allegations, the officers arrested Ms. Sylla and separated her from her 9-month-olddaughter.

241. Ms. Sylla was never given a chance to make a statement to the police.

242. When Ms. Sylla arrived at the 40th Precinct, no one spoke to Ms. Sylla in French or asked her if she needed an interpreter. Ms. Sylla was not afforded the opportunity to file a domestic incident report against her husband, and spent the evening in the precinct jail.

243. Ms. Sylla was not reunited with her daughter until May 30th, after her attorneys filed

emergency papers in Family Court.

**Ms. Soledad Julia Hilares Huarca de Ruiz**

244. Ms. Soledad Julia Hilares Huarca de Ruiz is a limited English proficient woman who lives on Staten Island.  Her primary language is Spanish.

245. Ms. Huarca de Ruiz recently moved to the U.S. with her 8 year-old daughter to join her husband on Staten Island. Her husband is mentally ill and disabled. He is dependent on his parents.

246. Ms. Huarca de Ruiz has been abused verbally and psychologically by her mother-in-law since arriving in this country. She is scared that her mother-in-law is going to physically hurt her.  Ms. Huarca de Ruiz experiences daily harassment by her mother-in-law.

247. On September 5, 2014, her mother-in-law was especially abusive towards her.

248. She felt that the verbal abuse was going to escalate into physical violence. She felt unsafe so she called 911.

249. The police officers who arrived at her home, located at 200 Targee Street on Staten Island, did not speak Spanish. Ms. Huarca de Ruiz believes they were from the 120 precinct. They did not attempt to utilize any interpretation services.

250. The police officers were met by the Ms. Huarca de Ruiz's mother-in-law and other family members who speak English. Her brother-in-law told the officers that Ms. Huarca de Ruiz was being insulting and tried to hurt them physically. Ms. Huarca de Ruiz did not understand most of the conversation but understood when the officers told her to "Go away".

251. Ms. Huarca de Ruiz was very scared and said that she knew that her inability to speak English was causing a communication problem with the police. They did not allow her to file a report but her brother-in-law was able to file a report against her.

252. On September 8, 2014, Ms. Huarca de Ruiz went to the 120 precinct with a paralegal from Staten Island Legal Services in order to file a report. They waited about 1.5 hours and were repeatedly told that they had to wait for an officer who could operate language line. At one

point, an officer approached the paralegal and asked her some questions about the client. The paralegal repeatedly stated that the officer should speak to the client with an interpreter.

253. On September 9th, Ms. Huarca de Ruiz and her social worker returned to the precinct in an attempt to file a report. They were asked numerous times what they needed and each time they stated that they needed a Spanish interpreter to make a report.

254. A person working at the front desk asked a member of the public to interpret for Ms. Huarca de Ruiz. Ms. Huarca de Ruiz could not understand this person and did not understand what the NYPD employee was attempting to communicate.

255. The paralegal repeatedly requested an interpreter and reiterated that Ms. Huarca de Ruiz wanted to file a DIR. The NYPD employee at the front desk then told the paralegal that someone from the DV unit would take her report using the language line.

256. When the DV officer arrived, approximately 30 minutes later, he asked the paralegal to explain Ms. Huarca de Ruiz's issue. The paralegal directed him to speak withMs. Huarca de Ruiz directly.

257. The officer, badge # 5669, then communicated with client using Language Line. Officer Chi then approached Ms. Huarca de Ruiz and the paralegal, and told them in English that her husband and brother-in-law were at the precinct yesterday asking about her and her daughter. Officer Chi, who was one of the officers who arrived at Ms. Huarca de Ruiz's home on 9/5/14, asked the paralegal where Ms. Huarca de Ruiz was staying and why she was afraid of her husband.

258. The paralegal told officer Chi that it would be better to speak to Ms. Huarca de Ruiz directly. Officer Noto, from the DV unit, then told Ms. Huarca de Ruiz to go to Family Court to petition for an Order of Protection. Officer No to initially refused to file a DIR for Ms. Huarca de Ruiz, but after the paralegal intervened, he agreed to do so. Ms. Huarca de Ruiz and her paralegal were in the precinct for 2.5 hours before she was able to file a DIR.

**Mr. BhishmaYogi**

259. On August 8, 2014, Mr. Bhishma Yogi, a limited English proficient Nepali- speaking man who was an employee of a pool hall in Queens was arrested during a raid because of suspected gambling.

260. He was approached by the police officers and tried to tell them he was just an employee, but mistakenly said "employer".

261. One police officer asked him if he spoke Korean and he told them he spoke Nepali. He tried to talk more but they kept telling him to "shut up".

262. Mr. Yogi was handcuffed and arrested. He was taken in a van for a while and then to the 115th precinct. He was arrested around 4pm on a Friday and was not released until about 9 pm Saturday.

263. After others arrested at the same time had already been released, Mr. Yogi finally asked a police officer what was happening as best as he could in English. They told him they did not have a Nepali interpreter available so they had to wait.

264. No one ever spoke to him or used an interpreter while he was in police custody for approximately 29 hours. Mr. Yogi did not know what he was being charged with. While riding in the van he asked if he could use a bathroom many times and the officers refused. Mr. Yogi was forced to pee on himself in the van. He also has diabetes and was not given food that he could eat.

**Ms. Pema Sherpa**

265. Ms. Pema Sherpa, a limited English proficient Nepali-speaker, is a victim of domestic violence.

Ms. Sherpa's husband would punch her, hit her, scratch her and otherwise abuse her.

266. On June 24, 2013 her husband attacked her. In her defense, she pushed him away and his glasses cut his face. He called the police but Ms. Sherpa did not know that at the time.

267. Later that night, Ms. Sherpa was asleep in her home next to her children. The next thing she knew, police officers were in her home and arrested her. She did not know what was

38

happening and no one gave her any explanation that she could understand. She was handcuffed in front of her children. She was not provided with interpretation and was never offered the opportunity to make a statement herself.

268. Ms. Sherpa was taken to the 108th precinct in Queens.   The police did not offer her an interpreter or ask her if she would like to make a statement at any time. Ms. Sherpa spent the night in jail and was allowed to leave the next day.  Ms. Sherpa was scared and did not know what was happening.

269. Upon discharge, a police officer wrote a note in English for her that reads, "call 911 tell them: I have an OP and I need a police escort to remove things from my home. I spoke to Officer Maria at 108 precinct."

270. Ms. Sherpa continues to be threatened by her husband and has lost all faith in the police to help her.

**Ms. Xiao Fan Li**

271. Ms Xiao Fan Li is a limited English proficient Mandarin speaker.  Ms. Li lives in Brooklyn. On January 19, 2013, Ms. Li's husband shoved her against a dresser and she fell to the floor. Later that same day, he kicked her to the floor. That's when Ms. Li called 911 and spoke to a Mandarin-speaking operator.

272. She told the operator that her husband was beating her and she needed assistance. When officers arrived at her home, none of them spoke Mandarin or offered to provide her with an interpreter.

273. The officers were speaking with her husband in English within hearing distance.

274. The officers asked her if she wanted her husband to be arrested. She didn't know what "arrested" meant. No arrest was made. If Ms. Li had known what "arrested" meant, she would have wanted him arrested.

275. The officers asked Ms. Li if she needed medical assistance. Her back hurt and she'd had surgery on it before, and she was sick, so she said yes.  An ambulance transported Ms. Li to

Lutheran Medical Center.

276. Ms. Li wanted legal protection but did not believe she needed mental health treatment. Ms. Li was admitted to the medical center but did not know that she would not be allowed to leave without the doctor's permission. Ms. Li was admitted from 1/20/13-1/22/13.

277. On January 22, 2013, after she was discharged from the hospital, Ms. Li went to the 62nd precinct in order to file a report and press charges. The precinct did offer her an interpreter, but the interpreter spoke Cantonese, not Mandarin, and Ms. Li could not understand him. Ms. Li spoke to a female officer, then she was escorted home.

278. The next day, police officers came to Ms. Li's home to get more information and to take photos. Again, they did not speak Mandarin nor did they offer her interpreter services.

**Sabina Peralta**

279. Sabina Peralta is a twenty-nine year old monolingual Spanish-speaking woman from Mexico.

280. Ms. Peralta can understand some basic English.

281. On June 8, 2014, at about 3 or 4pm, Ms. Peralta and her children, sister, and sister's children were in the Frank D. O'Connor Playground, in Elmhurst, Queens, across the street from Elmhurst Hospital Center. At the time, her daughter, Elizabeth Peralta, was four months old, and her son, Bayron Suastegui Peralta, was five years old. Ms. Peralta's nephew Brandon Mejia, was two years old, and her niece, Tamara Romero, was 8 or 9 years old.

282. Ms. Peralta's sister, Lucy Peralta, was about 34 years old and she is also a monolingual Spanish speaker.

283. When they arrived at the playground, her sister, Lucy, sat down on a bench to put shoes on her son Brandon's feet, while he was sitting in his stroller. While her sister was putting on Brandon's shoes, a woman sitting on the same bench said that the bench was occupied, and that she was waiting for her husband. This woman spoke to her sister in Spanish. Ms. Peralta later learned that this woman's name was Yessenia Lucero. Neither Ms. Peralta nor her

40

sister had ever seen her before.

284. After Ms. Lucero said that the bench was occupied, Ms. Peralta's sister told her that she could not kick her off the bench because the bench is for the public. Ms. Lucero then responded that her sister had to get off the bench because Ms. Lucero was saving the bench for her husband. Her sister again responded that she could not tell her to leave because the bench was public. Her sister then said that she would leave soon anyway as soon as she was finished putting on her son's shoes. Ms. Lucero said again, in a very aggressive voice, "Get off! Didn't you hear me? I told you to get off."

285. Ms. Peralta's sister responded, "You cannot make me get off the bench" and she continued to put her son's shoes on him. Ms. Lucero had with her a plastic bag with water in it, and threw the water in Ms. Peralta's sister's face. The two women continued to argue until Ms. Lucero reached over and grabbed Ms. Peralta's sister by her hair and pulled her hair hard. In response, Ms. Peralta's sister reached over and grabbed Ms. Lucero's hair. The two women got up from the bench and were holding each other's hair.

286. While all of this was happening, Ms. Sabina Peralta was holding her four month old daughter in her arms and feeling terrified as she watched Ms. Lucero attack her sister. Her son, Bayron, and her niece, Tamara, started crying. In addition to being afraid for her sister's safety, she was worried about the safety of her children and her niece and nephew. She was shocked at how quickly everything happened and was worried Ms. Lucero would go after the Children next.

287. About one or two minutes later, Ms. Lucero's husband arrived and he pushed Ms. Peralta's sister hard and ripped her blouse. When he pushed her, she fell backwards against the bench. He was holding her down against the bench, and grabbing her blouse with his hand. While she was against the bench, Ms. Lucero was still pulling on her hair.

288. While Ms. Lucy Peralta was against the bench, and being held by Ms. Lucero and her husband, Ms. Sabina Peralta put her daughter down in her stroller, and took a step towards

Ms. Lucero and her husband and told them to let her sister go. She then tried to separate them when Ms. Lucero kicked her hard in her abdomen with her closed toed shoes. Because she had just had a C-Section, and she kicked her incision site, she felt an immediate searing pain, and began to bleed. Her stitches came open and she was in a great deal of pain.

289. Ms. Lucero then lunged again for her sister and pulled her hair again. As she did this, her husband shouted at her, "Calm down." After he shouted at her, Ms. Lucero called Ms. Lucy Peralta, "a fucking bitch", "ugly black one", and "fat" and told her to go back to her country. Ms. Lucy Peralta began to cry and the children, Tamara, Brandon, and Bayron were all crying.

290. Ms. Lucy Peralta said that she was going to call the police. When Ms. Lucero heard her say this, she said she was going to call the police first. Then, Ms. Lucero called the police. Since she was calling the police, Ms. Peralta and her sister didn't think to also call the police because they thought that the police would interview everyone to find out what happened.

291. A patrol car with approximately four male officers from the 110th precinct arrived with an ambulance. They were all white Americans and they only spoke English. They told Ms. Peralta and her sister that they did not speak Spanish. Ms. Lucero began speaking to the police officers in English. A bystander then came up to Ms. Sabina Peralta and asked her if she wanted her to interpret for her and the police.  Ms. Sabina Peralta said yes.

292. Ms. Lucy Peralta then began telling the bystander that Ms. Lucero had thrown water in her face and asked the bystander to interpret for her. But before the bystander could say anything, the police waved her away and wouldn't listen to what she had to say. The police completely ignored her. When the woman realized that they wouldn't listen to her, she walked away. As she walked away, the bystander told us that she wanted to help us but the police would not listen to her.

293. The police officers continued to only ask Ms. Lucero and her husband what had happened. They never asked the Peralta sisters what happened. They only approached them to ask us

for identification when they informed them that they would both be arrested.

294. When the police told Ms. Sabina Peralta that she was going to be arrested, she started to cry because she was terrified for the safety of her children.

295. The police took Ms. Sabina Peralta, her sister, her two children, and her niece and nephew to the precinct. Ms. Lucy Peralta's sister's husband came to the precinct to pick up the children.

296. After her sister's husband arrived, the police took everyone to Jamaica. The sisters were fingerprinted and put in jail overnight. No one ever explained to them why they were there or why they had been arrested. That night, Ms. Sabina Peralta was in pain from Ms. Lucero's kick. If the police had not arrested her, she would have gone to the hospital to be treated for her open incision site.

297. The next day, while they were waiting to be seen by the judge, a police officer, not one who had arrested them, said to them, "Fuck you Mexican." The other police officers nearby began to laugh.

298. Ms. Sabina Peralta is a survivor of domestic violence and had always thought the police would protect her if she needed help. She never realized that she could be treated this way by the police. She now fears that the police are unable and unwilling to protect her and her family from abuse, and believes that the police discriminated against her family for not speaking English and for being Mexican.

299. Ms. Peralta and her family experienced severe mental and emotional anguish and emotional and physical pain as a result of the actions of the New York City Police Department and its officers.

**Leonor Tejada**

300. Ms. Leonor Tejada is a monolingual twenty-eight year old Spanish-speaking woman from the Dominican Republic. Ms. Tejada understands some very basic English.

301. From January, 2014, to October 17, 2014, Ms. Tejada lived at 2300 Olinville Avenue, Apt.

17E, Bronx, NY 10467 with her ex-boyfriend, Dennis Alvarez.

302. Mr. Alvarez had previously exhibited aggressive behavior towards her. On or about April or May, 2014, Mr. Alvarez and Ms. Tejada were discussing the possibility of having children. At the time, Ms. Tejada was using contraception in the form of an intrauterine device (IUD), and they agreed that it should be removed so that Ms. Tejada could become pregnant. Ms. Tejada insisted on having a professional remove the IUD, but Mr. Alvarez refused to allow her to go to the hospital. He proceeded to forcibly remove the IUD himself, which resulted in an infection and heavy bleeding for ten days.

303. On the evening of October 17, 2014, Ms. Tejada was with Mr. Alvarez in the apartment they shared on Olinville Avenue. At about 11:00pm, Mr. Alvarez forcibly pushed Ms. Tejada out of the apartment and punched her in her right eye. When he punched her, she stumbled on the entryway of the door and hit the right side of her face against the hallway wall before falling to the floor. Mr. Alvarez then locked her out of the apartment and she sat in the hallway.

304. Mr. Alvarez then opened the door and told Ms. Tejada that he was going to call the police. She told him to go ahead and do so. Mr. Tejada called the police around 11pm or midnight.

305. When the police had not arrived by 1:15am, Ms. Tejada called 911 to ask why they had not arrived. When she called, she asked the operator if she spoke Spanish. The operator responded, "Not too much." She then attempted to explain to the 911 operator what had happened using a mixture of Spanish and broken English. She requested a patrol car and the operator said that one would arrive.

306. While Ms. Tejada was waiting for the police, she went to the laundry room to charge her cell-phone.

307. A patrol car from the 49th precinct arrived at about 2:00 am. Two white police officers approached Ms. Tejada and asked if she was the person with the problem. She responded, "Si." ("Yes.") She asked the officers, "¿Usted habla español?" ("Do you speak Spanish?")

44

The officer replied, "Not too much. I don't speak too much Spanish." Ms.Tejada responded in Spanish and asked him how he was going to understand her if he didn't speak Spanish.

308. Ms. Tejada then attempted to explain to the officers in Spanish what her ex- boyfriend had done to her. The conversation lasted only about five minutes.

309. The officers left Ms. Tejada and went to interview Mr. Alvarez who speaks English. Ms. Tejada followed the officers upstairs and waited in the hallway. The officers interviewed Mr. Alvarez for about 25 minutes. Ms. Tejada could not hear much of the conversation but she could hear that Mr. Alvarez was speaking with a lot of confidence and that the interview ended with the officers saying, "We understand."

310. When the police officers left the apartment, they told Ms. Tejada in English that this was not domestic violence and that it was just a couple having a fight. Ms. Tejada asked them in English, "You don't see my face?" They responded, "Yes, but this is a discussion with your boyfriend. This is not going to court. This is not going anywhere." They told Ms. Tejada there was nothing they could do. The police officers told her that because Mr. Alvarez was on the lease and she was not, he was the only one who could make are port.

311. Ms. Tejada informed the officers in Spanish that she did not have anywhere to go, and asked the officers for somewhere that she could go to sleep. They told her that they did not know of anywhere. Ms. Tejada could not believe what they were telling her. They then left the building.

312. Ms. Tejada was locked out of her apartment and left the building and sat on a park bench out front. She saw Mr. Alvarez exit the building to move his car. She remained on that park bench all night.

313. Ms. Tejada used her cell-phone to take pictures of her bruised face.

314. The following day, October 18, 2014, Ms. Tejada realized that Mr. Alvarez had disconnected her cell phone service. She had no way to make phone calls. She went to Dunkin' Donuts to use their Wi-Fi and was able to get in touch with her aunt.

315. Ms. Tejada's aunt accompanied her to a precinct on W. 148th St. in Manhattan. She believes it is the 32nd Precinct. Ms. Tejada completed a Domestic Incident Report at the precinct that same day, October 18, 2014. Her statement was written in Spanish.

316. Ms. Tejada kept calling the 49th Precinct to receive updates on her case and to find out why Mr. Alvarez had not been arrested. She kept being told that there was no one at the precinct that spoke Spanish. The detective assigned to the case also does not speak Spanish.

317. It took one week after completing the report for Mr. Alvarez to be arrested.

318. On October 24, 2014, Ms. Tejada filed a Family Offense Petition in Bronx Family Court. On the same day, a Temporary Order of Protection was issued against Mr. Alvarez.

319. The only correspondence Ms. Tejada received from the 49th Precinct was a pamphlet titled "A Victim's Guide to Restitution in New York State." This pamphlet was in English.

320. Ms. Tejada always thought the police would protect her if she needed help.

321. She never realized that she could be treated this way by the police. Ms. Tejada has lost complete confidence in the police's ability to protect her from future violence, and she believes that the police discriminated against her for not speaking English.

**Maritza Vega**

322. Maritza Vega is a limited English proficient woman who lives on Staten Island. Her primary language is Spanish.

323. From approximately April 2014 until the fall of 2014 Ms. Vega was in a romantic relationship with Luis Urquiza who threatened her, and abused her sexually and verbally.

324. On November 6, 2014 Mr. Urquiza harassed Ms. Vega over the phone and eventually went to Vega's apartment at 169 Dixon Ave in Staten Island, NY. Mr. Urquiza then shouted at Ms. Vega and would not leave when asked to do so. When Mr. Urquiza attempted to force his way into the home and then urinated on the side of the building, Ms. Vega was very frightened and called 911.

325. Mr. Urquiza stayed in his car by the curb for several hours, while she stayed inside. To the

best of Ms. Vega's knowledge, the police never arrived.

326. On November 7, 2014 Ms. Vega went to the 121st precinct to file a police report. She was told that the police had gone to the house the day before. Ms. Vega completed the Statement of Allegations in Spanish but was not provided with an interpreter.

327. November 8th and 9th the police came by Ms. Vega's apartment while she was at work. Anticipating that the police needed to see her in reference to the report she had filed, she went to the precinct on the afternoon of November 9th.

328. When Ms. Vega arrived at the precinct, she was told that her ex-boyfriend had said that she scratched him and they arrested her on the spot. Ms. Vega was only spoken to in English and was permitted to respond only in English.

329. Ms. Vega spent the night of November 9th in jail.

330. As a result of the criminal case that was brought against her, Ms. Vega's driver's license was temporarily suspended and she was unable to continue her work as a taxi driver causing significant financial hardship for herself and her two children.

**Violence Intervention Program**

331. The Violence Intervention Program, Inc. ("VIP") is a nationally recognized non- profit organization that aims to remedy and to prevent violence against women.  VIP delivers a full range of services including on-site counseling, residential accommodations and child care. VIP has offices in Manhattan, the Bronx and Queens.

332. VIP serves approximately 1,400 women per year and annually receives approximately 12,000 hotline calls. The majority of VIP's clients are Spanish-speaking women with limited English proficiency.

333. VIP counselors and advocates regularly interact with LEP domestic violence victims who report experiencing language barriers when attempted to communicate with the NYPD both at the station houses and in the field with officers who respond to 911 calls.

334. VIP clients are regularly told by the NYPD that there is no one who can communicate with

them in Spanish and that they must speak English.

335. English speaking police officers often communicate only with their English- speaking abusers of VIP clients and do not speak directly with the LEP victim at all.

336. As a result, many VIP clients, in addition to experiencing fear, frustration and humiliation, are denied vital assistance and are prevented from filing police reports and making statements.

337. As a result of NYPD's failure to provide language access services, VIP counselors and advocates are regularly compelled to spend portions of their work day assisting LEP clients in communicating with the NYPD. VIP staff members frequently call precincts and/or other NYPD locations to complain about lack of interpreter services, interpret over the phone with the NYPD when the NYPD fails to provide interpreters for their clients, and accompany LEP clients to precincts in order to interpret for them.

338. The NYPD's failure to provide interpretation for LEP individuals imposes a significant and ongoing burden on VIP staff members as they attempt to assist their clients. The constant need to assist LEP clients in communication with the NYPD means that counselors are often unavailable to provide the numerous other services that VIP offers.

### CLAIMS FOR RELIEF
### FIRST CAUSE OF ACTION:
### INTENTIONAL DISCRIMINATION UNDER TITLE VI OF
### THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(d), *et seq.*

339. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

340. The NYPD is a CITY municipal agency in receipt of funding from the federal government.

341. Discrimination based on race and national origin, is prohibited by recipients of federal financial assistance under 42 U.S.C. § 2000(d), et seq.

342. Defendant(s), through their policy, custom or practice, intentionally discriminated against Plaintiffs based on their national origins and limited English proficient status in violation of

48

Title VI of the Civil Rights Act and its implementing regulations.

343. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered injuries and damages and have been deprived of their rights under the civil rights laws.

## SECOND CAUSE OF ACTION:
## VIOLATION OF THE SAFE STREETS ACT, 42 U.S.C. §3789d

344. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

345. The Safe Streets Act, 42 U.S.C. § 3789d, and its implementing regulations prohibit discrimination, inter alia, on the basis of national origin by programs funded in whole or in part from funds made available under 42 U.S.C. § 3789d(c)(4). The regulations were promulgated by the United States Department of Justice and codified at 28 C.F.R. §42.203.

346. The NYPD receives federal funding that subjects it to the requirements of the Safe Streets Act.

347. Defendant(s), through their policy, custom and/or practice, intentionally discriminated against Plaintiffs based on their national origins and limited English proficient status in violation of the Safe Streets Act and its implementing regulations.

348. As a direct and proximate result of the above-mentioned acts, Plaintiff decedents suffered grave injuries causing their deaths and have been deprived of their rights under the Safe Streets Act and its implementing regulations.

## THIRD CAUSE OF ACTION:
## DISCRIMINATION UNDER THE EQUAL PROTECTION CLAUSE OF THE U.S. CONSTITUTION

349. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

350. Defendant(s) denied Plaintiffs equal access to the services and protections of the NYPD based on their national origins. Such discrimination violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

351. Defendant(s) acted under color of state law to deprive the Plaintiffs of their Fourteenth

Amendment rights.  A cause of action is created by 42 U.S.C. §1983.

352. As a direct and proximate result of the above-mentioned acts, Plaintiffs suffered grave injuries resulting in their deaths.

## FOURTH CAUSE OF ACTION:
## DISCRIMINATION UNDER THE EQUAL PROTECTION CLAUSE
## OF THE NEW YORK STATE CONSTITUTION

353. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein

354. Defendant(s) denied Plaintiffs equal access to the services and protections of the NYPD based on their national origins. Such discrimination violates the Equal Protection Clause of the New York State Constitution.

355. As a direct and proximate result of the above-mentioned acts, Plaintiffs suffered grave injuries resulting in their deaths.

## FIFTH CAUSE OF ACTION:
## DEPRIVATION OF RIGHT TO PETITION GOVERNMENT
## FOR REDRESS OF GRIEVANCES UNDER U.S. CONSTITUTION

356. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

357. Defendant(s), through their policy, custom or practice of denying language services to limited English proficient individuals, prevented Plaintiffs from filing complaints and reports and otherwise communicating with police officers from whom they sought assistance.

358. Defendant(s) acted under color of state law to deprive Plaintiffs of their First Amendment right to petition the government for the redress of grievances. A cause of action is created by 42 U.S.C. §1983.

359. As a direct and proximate result of the above-mentioned acts, Plaintiffs suffered grave injuries resulting in their deaths.

## SIXTH CAUSE OF ACTION:
## DEPRIVATION OF RIGHT TO PETITION THE GOVERNMENT UNDER
## ARTICLE I, §9 OF THE NEW YORK STATE CONSTITUTION

360. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

361. Defendant(s), through their policy, custom or practice of denying language services to limited English proficient individuals, prevented Plaintiffs from filing complaints and reports and otherwise communicating with police officers from whom they sought assistance.

362. Defendant(s) thereby deprived Plaintiffs of their right under the New York State Constitution to petition the government.

363. As a direct and proximate result of the above-mentioned acts, Plaintiffs suffered grave injuries resulting in their deaths.


## SEVENTH CAUSE OF ACTION:
## INTENTIONAL DISCRIMINATION BASED ON NATIONAL ORIGIN
## UNDER NEW YORK CITY'S HUMAN RIGHTS LAW

364. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

365. Defendant agency NYPD is a public accommodation under the NYC Human Rights Law.

366. Defendants' custom and practice of refusing to offer and provide interpretation services to limited English proficient Plaintiffs and others seeking to access NYPD services intentionally discriminates against Plaintiffs and other persons of foreign national origin by denying them access to the services and protections of the NYPD in violation of the New York City Human Rights Law.

367. Defendant(s)' wanton disregard and failure to provide translation services of Deisy Garcia Alavarado's cries for help because of her complaining in Spanish constitutes intentional discrimination based on their national origin and deprives them of their rights under the New York City Human Rights Law.

368. Plaintiffs are entitled to injunctive relief and damages in an amount to be determined by the

court.

## EIGHTH CAUSE OF ACTION:
## DISPARATE IMPACT DISCRIMINATION BASED ON NATIONAL ORIGIN UNDER NEW YORK CITY'S HUMAN RIGHTS LAW

369. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

370. Defendant agency, the NYPD, is a public accommodation under the NYCHRL.

371. Defendants' custom and practice of refusing to offer and provide interpretation services to limited English proficient Plaintiffs and others seeking to access NYPD services disparately impacts Plaintiffs and other persons of foreign national origin by denying them access to the services and protections of the NYPD offered to English speakers, in violation of the New York City Human Rights Law.

372. Plaintiffs are entitled to damages in an amount to be determined by the court.

**NINTH CAUSE OF ACTION:**
**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.     Declare that Defendant(s)' actions violated the Plaintiffs' rights under the U.S. Constitution, the New York Constitution, Title VI of the Civil Rights Act of 1964, the Safe Streets Act, the laws of New York State, and New York City Human Rights Law;

2.     Issue a judgment against the City of New York in an amount to be determined by the Court, including compensatory damages for the grave injuries and deaths sustained by Plaintiffs in amounts that are fair, just, and reasonable;

3.     Order Defendants to pay reasonable costs and attorneys' fees to the Plaintiffs;

4.     Grant any other relief the Court deems just and proper.


Dated: March 1, 2016
       New York, New York


                              Yours,


                              Terrell H. McCasland, ESQ., 5231188
                         FOR:  SUBIN ASSOCIATES, LLP
                              Attorneys for Plaintiff s
                              150 Broadway, 23rd floor
                              New York, New York 10038

## ATTORNEY'S VERIFICATION (AMENDED COMPLAINT)

STATE OF NEW YORK      )

                            )   ss.:

COUNTY OF NEW YORK    )

TERRELL H. MCCASLAND, ESQ., an attorney at law duly admitted to practice in the Courts of the State of New York, affirms under the penalties of perjury as follows:

I am the attorney for the plaintiff in the above-captioned action. I have read the foregoing AMENDED COMPLAINT and know the contents thereof which are true to my own knowledge, except as the matters therein stated to be alleged on information and belief, and as to these matters, I believe it to be true.

The reason this verification is made by me and not by the plaintiff is that the plaintiff resides in a county other than the one in which I maintain my office.

The source of my information and the grounds of my belief are communications with my client, Luzmina B. Alvarado Rodriguez, and others, papers, reports, and investigation contained in the file.

Dated:  New York, New York
         March 1, 2016

TERRELL H. MCCASLAND, ESQ.

SWORN TO BEFORE ME THIS
1ST DAY OF MARCH, 2016

Notary Public

VIRGINIA I. DELGADO
Notary Public, State of New York
No. 01DE6133022
Qualified in Queens County
Commission Expires September 6, 20__

2016 MAR -1 PM 1:06

54

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* The City of New York

was received by me on *(date)* March 1, 2016 .

☑ I personally served the summons on the individual at *(place)* 100 Church Street

on *(date)* March 1, 2016 ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

, a person of suitable age and discretion who resides there,

on *(date)* , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* Mrs. Mayzack , who is

designated by law to accept service of process on behalf of *(name of organization)*

City of New York on *(date)* March 1, 2016 ; or

☐ I returned the summons unexecuted because ; or

☐ Other *(specify):*

My fees are $ for travel and $ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: March 1, 2016

Uribe Alexander
*Server's signature*

Uribe Alexander
*Printed name and title*

Subin Associates, 150 Broadway 10038
*Server's address*

Additional information regarding attempted service, etc: